# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| **CELITA NOEL,** )<br><br>)<br>**Plaintiff,** )<br><br>)<br>**v.** )<br><br>)<br>**EQUIFAX INFORMATION SERVICES, LLC,** )<br>SERVE:  Corporation Service Company, Reg. Agent )<br>          100 Shockoe Slip )<br>          2nd Floor )<br>          Richmond, VA  23219 )<br><br>)<br>**EXPERIAN INFORMATION SOLUTIONS, INC.,** )<br>SERVE:  CT Corporation System, Reg. Agent )<br>          4701 Cox Rd., Ste. 285 )<br>          Glen Allen, VA 23060 )<br><br>)<br>**and** )<br><br>)<br>**TRANS UNION, LLC,** )<br>SERVE:  Corporation Service Company, Reg. Agent )<br>          100 Shockoe Slip )<br>          2nd Floor )<br>          Richmond, VA 23219 )<br><br>)<br><br>)<br>**Defendants.** )<br>) | **Civil Action No.**  3:24cv862 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Celita Noel, by counsel, and for her Complaint against Defendants Equifax Information Services, LLC ("Equifax), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union"), she states as follows:

## PRELIMINARY STATEMENT

1.     This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2.     The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

3.     Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

4.     Equifax, Trans Union, and Experian are the USA's major consumer reporting agencies (hereinafter, these 3 are collectively referred to as the "CRAs" or "CRA Defendants").

5.     The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

6.     This requirement of reasonable procedures designed to ensure the maximum possible accuracy of information CRAs report is meaningful, and no mere formality. The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from their creditor-customers, particularly when a consumer makes a dispute about information reported.

7.     Plaintiff brings claims under Section 1681e(b) against Equifax, Trans Union and Experian because each reported inaccurate account information about Plaintiff regarding her Nationstar mortgage. When Plaintiff disputed the inaccuracies, Equifax, Trans Union, and Experian did not reasonably investigate, also violating Section 1681i.

8.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax, Trans Union, and Experian have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax, Trans Union and Experian have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

10.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2). Plaintiff resides in this District and Division and all relevant facts regarding her injuries occurred

here.

## PARTIES

11.     Plaintiff is a natural person residing in the State of Virginia, and at all times relevant to the Complaint was a "consumer" as defined by 15 U.S.C. § 1681a(c).

12.     Equifax is a foreign limited liability company authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

13.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

14.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

15.     Trans Union is a foreign limited liability company authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

16.     Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

17.     Trans Union disburses consumer reports to third parties under contract for monetary compensation.

18.     Experian is a foreign corporation authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

19.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.     Experian disburses consumer reports to third parties under contract for monetary compensation.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

21.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

22.     "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer

oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

23.     Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

24.     Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

25.     Section 1681i(a), on the other hand requires much more from a CRA after a

consumer has placed it on notice of an inaccuracy through their dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency of the directly… of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

26.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate

and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin*

*v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term

'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching

inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations

omitted).

27.     It has long been the law that a CRA, such as Equifax, Trans Union or Experian,

does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by

merely contacting the creditor who supplied the dispute item.  *See, e.g.*, *Pinner v. Schmidt,* 805

F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to

contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols.,*

*Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781

F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-

LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No.

1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could

find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

28.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).   Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

29.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

30.     Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation,"

8

necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

31.    It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

## Background Information

32.    In February of 2017, Plaintiff filed a petition for the protection of a Chapter 13 reorganization bankruptcy in the Eastern District of Virginia, Richmond Division (Case No. 17-30652-KLP).

33.    At the time that Plaintiff filed her petition, Plaintiff owned (and continues to own) her home located in Northumberland County, Virginia, commonly known as 402 Folly Road, Heathsville, VA 22473-2708 (the "Property").

34.    The rights and obligations under the note secured by the Deed of Trust and the Deed of Trust encumbering Plaintiff's Property are referred to in this Complaint as Plaintiff's "Mortgage".

35.    At the time that Plaintiff filed her bankruptcy petition, Bayview Loan Servicing, Inc. ("Bayview') was the loan servicer of Plaintiff's Mortgage.

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

36.     Bayview filed a proof of claim in Plaintiff's bankruptcy, which it amended on June 28, 2017 (the "Mortgage Claim").

37.     The Mortgage Claim included $3,789.21 in pre-petition arrearages ($592.09 of which was a projected escrow shortage) to be paid through Plaintiff's bankruptcy plan.

38.     On September 8, 2020, Bayview changed its named to Community Loan Servicing, LLC ("CLS").

39.     During the pendency of the bankruptcy, Plaintiff fell behind on her post-petition Mortgage payments to CLS.

40.     In December of 2020, CLS filed a Motion for Relief from the Automatic Stay in Plaintiff's bankruptcy case, seeking permission from the court to modify the automatic stay to allow CLS to enforce its remedies to foreclose upon and obtain possession of the Property.

41.     In March 2021, the bankruptcy court entered an order to resolve CLS's Motion for Relief from the Automatic Stay, and this agreement was memorialized by a Consent Order Modifying the Automatic Stay (the "Consent Order") between CLS and Plaintiff, which was entered by the Hon. Keith L. Phillips in Plaintiff's bankruptcy case on March 26, 2021.

42.     The Consent Order provided that Plaintiff would "resume making all future regular monthly installment payments in the amount of $1,131.32 pending further notice from the mortgage company [(CLS)], as they become due commencing March 19, 2021." and " . . . cure any arrearage currently due to Movant for the months of August 19, 2021 through February 19, 2021, in the total amount of $6,404.38."

43.     In March of 2021, Plaintiff cured the entire post-petition arrearage owed per the Consent Order via a lump sum payment to CLS, at the address provided on the Consent Order.

44.     Plaintiff made all of the regular monthly payments that came due after entry of the Consent Order in a timely manner.

45.     Plaintiff, through the automatic "bill pay" service with her bank and its payment processor, sent all of the regular monthly payments that came due after entry of the Consent Order to CLS. These payments were sent electronically to a CLS bank account.

46.     CLS was the loan servicer of Plaintiff's Mortgage until the servicing of the Mortgage was transferred to Nationstar Mortgage, LLC ("Nationstar") on June 1, 2022 with notices and payments to be sent to RightPath Servicing.

47.     Upon information and belief, Right Path Servicing ("Right Path") is a fictitious name of Nationstar.

48.     On August 17, 2022, the Chapter 13 Trustee in Plaintiff's bankruptcy made the final payment distribution to cure the pre-petition arrearage owed on the Mortgage.

49.     Beginning June 1, 2022, RightPath Servicing (which is part of Nationstar Mortgage LLC) began servicing Plaintiff's Mortgage for Nationstar.

50.     When RightPath began servicing Plaintiff's Mortgage, Plaintiff was up to date on payments.

51.     When Plaintiff paid her mortgage payment for June of 2022, RightPath Servicing returned it to her bank account and failed to provide Plaintiff with any notice that it did so, as required by Regulation X.

52.     In October of 2022, RightPath Servicing began to wrongfully refuse to cash Plaintiff's checks.

11

53.     Plaintiff did not discover the returned payment until November 2022. In November of 2022, after discovering the returned payment, Plaintiff sent a double payment via certified check, which covered the June 2022 payment as well as the November 2022 payment.

54.     Plaintiff did not fail to make the required payments to RightPath as they came due.

55.     At no point during RightPath's servicing of Plaintiff's Mortgage was Plaintiff behind in her payments.

### *Plaintiff Discovers the CRA Defendants were Reporting Inaccurate and Derogatory Information Regarding Her Nationstar Mortgage and Disputes Those Inaccuracies*

56.     In December of 2022, Plaintiff requested copies of her consumer disclosures from Equifax and Experian through the Annual Credit Report service website, each dated December 19, 2022.

57.     In January of 2023, Plaintiff requested a copy of her Trans Union consumer disclosure from the Annual Credit Report service website, dated January 17, 2023.

58.     Plaintiff discovered that all three CRAs were reporting inaccurate and derogatory information regarding her mortgage account with Nationstar.

### Reporting on Equifax

59.     On Plaintiff's credit report dated December 19, 2022, Equifax was inaccurately and derogatorily reporting Plaintiff's Mortgage with an inaccurate status of "Over 120 Days Past Due", an inaccurate balance of $89,772, an inaccurate amount past due of $7,929, and an inaccurate comment of "180 days or more past due."

60.     Equifax's reporting was inaccurate, in part, because Plaintiff was not behind on her Mortgage payments.

12

**Reporting on Experian**

61.     On Plaintiff's credit report dated December 19, 2022, Experian was inaccurately and derogatorily reporting Plaintiff's Mortgage with an inaccurate status of "$7,929 past due as of Oct 2022", an inaccurate balance of $89,772, an inaccurate status of "180 days past due as of Oct 2022" in the payment history guide, and an inaccurate notation of "Past due 180 days" for October 2022 in the payment history.

62.     Experian's reporting was inaccurate, in part, because Plaintiff was not behind on her Mortgage payments.

**Reporting on Trans Union**

63.     On Plaintiff's credit report dated January 17, 2023, Trans Union was inaccurately and derogatorily reporting the Mortgage account with an inaccurate status of "Account Included in Bankruptcy" and inaccurate remarks of "Chapter 13 Bankruptcy."

64.     Nationstar's reporting on Trans Union was inaccurate because Plaintiff's account with Nationstar was specially excepted from her discharge and was no longer impacted by her bankruptcy.

**February 2023 Disputes**

65.     On February 28, 2023, Plaintiff mailed letters to Equifax, Experian, and Trans Union, disputing the inaccurate and derogatory information reporting on her respective credit reports.

66.     In her letter to Equifax, Plaintiff disputed the status of "Over 120 Days Past Due", the amount past due of $7,929, and the comment of "180 days or more past due." With her letter, Plaintiff included copies of the payments she had made to Nationstar from July of 2022 through January of 2023.

67.     In her letter to Experian, Plaintiff disputed the status of "$7,929 past due as of Oct 2022" and the notation of "180 days past due" for October 2022 in the payment history. With her letter, Plaintiff included copies of the payments she had made to Nationstar from July of 2022 through January of 2023.

68.     In her letter to Trans Union, Plaintiff disputed the status of "Account Included in Bankruptcy" and remarks of "Chapter 13 Bankruptcy." Plaintiff also specified that there should be no delinquency reporting with Nationstar because she had made all her required payments. With her letter, Plaintiff included copies of the payments she had made to Nationstar from July of 2022 through January of 2023.

69.     Equifax received Plaintiff's dispute letter on March 3, 2023.

70.     Experian received Plaintiff's dispute letter on March 6, 2023.

71.     Trans Union received Plaintiff's dispute letter on March 7, 2023.

**Responses to February 2023 Disputes**

72.     On or around March 29, 2023, Equifax forwarded its reinvestigation results to Plaintiff. Equifax updated the account to show an inaccurate status of "Over 120 Days Past Due Date", an inaccurate "Activity Designator" of "Transfer/Sold", an inaccurate $0 balance, inaccurate balances in the Payment History, and an inaccurate Status Code of "180 or More Days Past Due" for October 2022 through January 2023. The reporting was inaccurate because Plaintiff was not delinquent on the Nationstar account. Plaintiff had cured the entire arrearage owed per the Consent Order via a lump sum payment in March of 2021 (even prior to the Mortgage being transferred to Nationstar), and she had made every regular monthly payment that came due after entry of the Consent Order in a timely manner.

73.    On or around March 31, 2023, Experian forwarded its dispute results to Plaintiff. The dispute results demonstrate that the account with Nationstar was still inaccurately reporting as a derogatory account with an inaccurate status of "$12,471 past due as of Feb 2023" and an inaccurate balance of $89,772. The reporting was inaccurate because Plaintiff was not delinquent on the Nationstar account. Plaintiff had cured the entire arrearage owed per the Consent Order via a lump sum payment in March of 2021 (even prior to the Mortgage being transferred to Nationstar) and she had made every regular monthly payment that came due after entry of the Consent Order in a timely manner.

74.    On or around March 30, 2023, Trans Union forwarded its dispute results to Plaintiff.  The dispute results demonstrate that Trans Union updated the account to show an inaccurate status of "Account 120 Days Past Due Date", an inaccurate balance of $89,772, an inaccurate past due balance of $12,471, inaccurate remarks of "Maximum Delinquency of 120 days in 10/2022 and in 02/2023 for $12,471", and inaccurate ratings of "120+ days late" for October 2022 through January 2023. The reporting was inaccurate because Plaintiff was not delinquent on the Nationstar account. Plaintiff had cured the entire arrearage owed per the Consent Order via a lump sum payment in March of 2021 (even prior to the Mortgage being transferred to Nationstar) and she had made every regular monthly payment that came due after entry of the Consent Order in a timely manner.

75.    Defendants reported this inaccurate information on Plaintiff's credit, and damaged Plaintiff's credit, through their violations of Plaintiff's rights under the FCRA.

76.    Upon information and belief, Defendants did not cease reporting the inaccurate and derogatory information on Plaintiff's credit files until after Plaintiff filed a federal lawsuit against the Mortgage servicers, CLS and Nationstar Mortgage, LLC d/b/a/ RightPath.

***The CRA Defendants Did Not and Do Not***
***Conduct Any Investigation of Most Consumer Disputes***

77.    Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax, Trans Union, and Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas.  Equifax and Trans Union use a vendor, previously known as Intelenet Global Services and now as Teleperformance.

78.    Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[2]

79.    Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication.  That mailbox company receives consumer disputes and scans them into a batch with other disputes.

80.    Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

81.    Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select

---

[2] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S,A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue  her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Equifax for its farming-out investigations to Teleperformance.

one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.  For example, the most common relevant code is: "01 Not his/her."

82.     Teleperformance agents and Experian Chile are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

83.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

84.     In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union and Experian.  It gets sent to the Defendant CRAs' creditor customers (such as Nationstar) for their sole review and consideration.

85.     Both Equifax and Trans Union have taken the position in other litigation that it has no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv*., Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

86.     Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

87.     Regardless of whether these statements by the CRAs are correct, the credit reporting agencies believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

88.     Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiff's disputes.  Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *Plaintiff Suffered Actual Harm*

89.     Equifax, Trans Union, and Experian continued to report the inaccurate and derogatory Nationstar Account information on Plaintiff's credit reports even after being notified that this information is false. Upon information and belief, Equifax, Trans Union, and Experian did not stop reporting the inaccurate information until after Plaintiff filed a federal lawsuit against the Mortgage servicers, CLS and Nationstar Mortgage, LLC d/b/a/ RightPath.

90.     Plaintiff attempted to resolve these matters with Defendants and her credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

91.     As a result of the inaccurate and derogatory credit reporting, Plaintiff has suffered damages, including, but not limited to:

   a. Harm to her credit;

   b. Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

   c. Loss of time attempting to correct the inaccuracies;

d.  Stress associated with attempting to resolve this matter.

e.  Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: migraines, nausea, irritability, nightmares, chest pain, heart palpitations, crying spells, and shortness of breath.

### *Defendants' Conduct was Willful*

92.  The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

93.  Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

94.  As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

95.  The CRA Defendants have received numerous disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

96.     Just in federal court alone, during the past decade the creditor-furnisher disputed by Plaintiff has had to defend over one thousand consumer credit lawsuits.

97.     In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

98.     The CRA Defendants knew or should have known of this litigation history.

99.     The CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

100.    The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

101.    Each Defendant regularly receives unredacted consumer dispute details from this database.

102.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

103.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

104.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

105.    Further, over 190,000 of the CFPB complaints against Equifax, more than 160,000 complaints as to Trans Union, and over 145,000 complaints about Experian were based largely on their failure to reasonably investigate consumer disputes.

106.     Just in the last 12 months alone, Equifax, Trans Union and Experian have each been sued by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

107.     While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

108.     Equifax, Trans Union and Experian have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

109.     Equifax has even been warned by its home District Court, the Northern District of

Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

110.     Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

111.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

112.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

113.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

114.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[4]

115.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of

---

[3]    *Available    at*    https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.
[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

116.    Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

117.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

118.    Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b)
#### *against Equifax, Experian, and Trans Union*

119.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

120.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the inaccurate account information from Nationstar.

121.    As a result of Equifax's, Trans Union's, and Experian's violations of 15 U.S.C. § 1681e(b) Plaintiff suffered actual damages, including but not limited to: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, migraines, nausea, irritability, nightmares, chest pain, heart palpitations, crying spells, and shortness of breath.

122.    Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Equifax, Trans Union, and Experian each ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

123.    Equifax, Trans Union, and Experian each furnished multiple consumer reports to third parties containing the inaccurate tradeline information and they did so after receiving notice of these inaccuracies.

124.    The violations by Equifax, Trans Union and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by

the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Trans Union, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

125.   Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Equifax, Trans Union, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)**
*against Equifax, Experian, and Trans Union*

126.   Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

127.   Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from each of Plaintiff's credit files.

128.   Equifax, Trans Union and Experian each violated 15 U.S.C. § 1681i(a)(2) by its conduct which includes, but is not limited to, failing to send to the furnisher all relevant information that it received with Plaintiff's disputes.

129.   Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Nationstar account.

130.   Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff' credit files or modify the item of information upon a lawful reinvestigation.

131.     As a result of Equifax's, Trans Union's, and Experian's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, migraines, nausea, irritability, nightmares, chest pain, heart palpitations, crying spells, and shortness of breath.

132.     The violations by Equifax, Trans Union and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Trans Union, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

133.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Equifax, Trans Union, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

### DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)     Award Plaintiff actual and punitive damages for violations of the FCRA by Equifax, Experian, and Trans Union;

(2)     Award Plaintiff attorney's fees and costs under the FCRA;

(3)     Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)   Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

CELITA NOEL

By:

/s/ Emily Connor Kennedy
Emily Connor Kennedy, VSB #83889
CONSUMER LITIGATION ASSOCIATES, P.C.
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
Telephone: (804) 905-9900
Facsimile: (757) 930-3662
Email: emily@clalegal.com


Leonard A. Bennett, VSB #37523
Mark C. Leffler, VSB #40712
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 – Telephone
(757) 930-3662 – Facsimile
Email: lenbennett@clalegal.com
Email: mark@clalegal.com

*Counsel for Plaintiff*